2024 IL App (1st) 230579-U

SECOND DIVISION
March 29, 2024

No. 1-23-0579

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| DELFINA MARCANO, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County |
| | ) | |
| v. | ) | 2019CH8533 |
| | ) | |
| RETIREMENT BOARD OF TRUSTEES OF THE CITY | ) | Honorable |
| OF HARVEY POLICE PENSION BOARD, | ) | Michael T. Mullen, |
| | ) | Judge Presiding |
| Defendant-Appellee. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

## O R D E R

¶ 1     *Held*:   Termination of former police officer's disability pension was supported by manifest weight of evidence indicating officer was no longer disabled from police service. Also, officer failed to preserve due process claim for appeal**.**

¶ 2     J.J. Marcano was an exemplary sheriff's deputy in Florida for more than a decade while he was collecting a police officer's disability pension from Harvey, Illinois. The Board of Trustees of the Harvey Police Pension Fund (pension board or board) terminated the disability pension after hearing evidence about Marcano's recovery and ability to resume his duties as a Harvey police officer. The circuit court of Cook County reviewed and affirmed the board's decision. Marcano contracted COVID-19 and died during this litigation in early 2022. His estate seeks this court's

review, arguing that Marcano's disabling conditions were permanent. The estate also argues that the pension board violated his due process rights in 2016, three years before terminating the pension in 2019, by suspending the monthly payments, subject to reinstatement, based upon only an initial independent medical examination (IME) and Marcano's testimony, rather than a full hearing. The pension board responds that the manifest weight of the medical evidence and Marcano's employment history established that he was no longer disabled from police service. As for the due process claim, Marcano was given the initial IME and notice and opportunity to address the board prior to the payment suspension and he did not object to or otherwise challenge the entry of what was only an interim decision, so his argument should not be entertained by this court of review.

¶ 3    In an administrative review, we review the agency's decision, not the circuit court's decision. *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 66. Our review "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2020). "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court." 735 ILCS 5/3-110 (West 2020). Also, the "findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2020). Accordingly, we neither reweigh evidence nor make an independent determination of the facts. *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 244 (2009); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

¶ 4    An administrative agency's determinations can be subject to three distinct standards of

review. The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). The pension board's findings of fact are given considerable deference, but are subject to reversal if they are against the manifest weight of the evidence. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). Questions of law, however, are reviewed *de novo*, while mixed questions of law and fact are reviewed under the clearly erroneous standard. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998).

¶ 5    A factual finding is against the manifest weight of the evidence when it appears from the record that an opposite conclusion is clearly apparent. *Szewczyk v. Board of Fire & Police Comm'rs of Village of Richmond*, 2011 IL App (2d) 100321, ¶ 20; *Abrahamson*, 153 Ill. 2d at 88. To make such a finding, a court must conclude that all reasonable and unbiased persons, acting within the limits set by law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident. *Evert v. Board of Trustees of Firefighters' Pension Fund of City of Lake Forest*, 180 Ill. App. 3d 656, 660 (1989). It is not enough that there are conflicts in the testimony or that an opposite conclusion might be reasonable; since the weight of the evidence and the credibility of the witnesses is to be determined by the agency and there need be only some competent evidence in the record to support its findings. *Id.*

¶ 6    An administrative decision is clearly erroneous where the reviewing court is left with the definite and firm conviction that a mistake has been made. *Szewczyk*, 2011 IL App (2d) 100321, ¶ 20; *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State*

1-23-0579

*Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577-78 (2005).

¶ 7     The operative section of the Pension Code, section 3-116, provides:

"Examination and emergency service. A police officer whose duty is suspended because of disability may be summoned to appear before the board, and to submit to an examination to determine fitness for duty. The officer shall abide by the board's decision. If a police officer retired for disability, except one who voluntarily retires after 20 years' service, *is found upon medical examination to have recovered from disability*, the board shall certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position. In case of emergency, a disabled police officer may be assigned to and shall perform such duty without right to compensation as the chief of police or chief officer of the municipality may direct." (Emphasis added.) 40 ILCS 5/3-116 (West 2016)[1].

¶ 8     Marcano, who was born in 1971, went to high school in Harvey and became a Harvey patrol officer in January 1997, when he was 25 years old. He was injured a year later while conducting a solo *Terry* stop of an armed robbery suspect. The suspect's companion fired three shots, two of which struck Marcano. The first bullet entered Marcano's right shoulder. He would eventually make a full recovery from the shoulder wound. The next bullet missed him. The last bullet went through his left nostril and fragmented in his right temporal bone. A bullet fragment that protruded from his right ear was removed, but other pieces had to remain undisturbed to preserve his facial nerves and speech. It is undisputed that Marcano had permanent hearing loss.

---

[1] This version of the statute is not the current version. While this appeal was pending, the statute was amended with the addition of a concluding sentence: "This Section does not apply to a police officer who has attained the age of 60." Pub. Act 103-33, § 5, eff. June 9, 2023.

¶ 9    Just a few months after being shot, Marcano returned to work with the Harvey police force in May 1998 and was promoted from patrol work to a detective's position in the municipality's violent crimes unit. He now needed a hearing aid and applied for a disability pension. He could not properly fit the hearing aid, experienced feedback and echoing while wearing it, and in 1999 or 2000, chose to stop wearing the device entirely.

¶ 10    Details of the original pension proceedings are no longer available approximately two decades later. In this vacuum of information, a disagreement has arisen as to why the pension board granted the pension. According to Marcano's estate, his disability application was based on "severe" hearing loss and "inability to withstand the cold weather," which were permanent conditions from which he could never recover. According to the pension board, Marcano learned to accommodate the hearing loss and there is no record of cold sensitivity, so he was capable of returning to police work in Harvey.

¶ 11    The record compiled in the pension termination proceedings shows that after the pension was granted, Marcano worked almost continuously in law enforcement and other emergency response professions in Illinois and Florida. The record includes his April 2004 "Hillsborough County Civil Service Board Application for Employment," his May 2004 employment application to the Hillsborough County Sheriff's Office, and transcripts of his testimony before the pension board. Hillsborough County is the Florida county that spans the city of Tampa and its suburbs.

¶ 12    The record discloses that in September 1998 (nine months after the shooting), Marcano was hired by the Chicago Fire Department and was in paramedic training, until quitting in November 1998. He then visited family in Puerto Rico for many months, even getting a driver's license there. After that, he went to work in Florida for about nine months. His initial job in Florida

was as an investigator for Gryphon Specialty Services in Altamonte Springs, surveilling persons "suspected of insurance fraud." For the subsequent five months, he worked for Critical Intervention Services in Clearwater, where he started as a community service officer before being promoted to sergeant, and then to staff sergeant. As a community service officer, he was equipped with a "firearm & radio" as he "patrolled various sites on foot to maintain order and prevent crime." In the two sergeant positions, Marcano performed his duties with a "vehicle, radio, computer, flashlight, handcuffs and firearm."

¶ 13    Marcano explained in the narrative section of his Florida deputy application that he left his job with Critical Intervention Services because, "Similar duties threatened my disability status with [the] police department[,] so I decided it was in my best interest to go back home to Chicago in February of 2001. I was homesick and wanted to be taken off disability at the Police Department so I could be reinstated." Marcano returned to Illinois in February 2001, met with Harvey's mayor, Nickolas Graves, and asked about being reinstated to the local police force. The municipality was not able to give Marcano his job back, but Mayor Graves counseled Marcano to further his education.

¶ 14    Marcano did go back to school and returned to his previous employers in the communities of Dolton and Oaklawn, Illinois. He maintained Illinois licenses between 1998 and 2003 as an EMT/paramedic, Private Detective, and Private Security Contractor; and in April 2002, he was issued Illinois licenses to operate his own detective agency and a security contractor agency. Accordingly, he worked for the fire department in Dolton between November 1990 and May 2004, where he was an EMS coordinator, until he was promoted to lieutenant. Between June 1992 and May 2003, he worked for Daley's Ambulance in Dolton as a paramedic. From October 1995

through May 2003, he was employed by Eagle Investigations and Security in Oak Lawn serving as a security officer providing "security services at banks and construction sites," and then as a chief detective. In 2001, he also worked in the business of security and investigative services for Countrywide Detective Agency in Oaklawn. In that capacity, he "implemented community policing strategy in [the] contracted neighborhood" and "performed surveillance for theft deterrence" using "[a] vehicle, phone, flashlight, handcuffs, firearm and binoculars." In May 2002, Marcano graduated *summa cum laude* from a private college in Indiana with a bachelor's degree in law enforcement management. Just before graduating, in April 2002, he launched Special Investigation Service in Burnham, Illinois "to provide a remedy to custodial parents that suffer due to delinquent child support" and Elite Security Service in Chicago to provide onsite security. In Marcano's investigative business, he made use of "[a] computer and telephone." In the security job, he used "[a] computer, flashlight and handcuffs."

¶ 15    Marcano started the master of science program at the Indiana school where he had earned his bachelor of science degree, but in January 2003, he moved back to the Tampa area and transferred to Florida Metropolitan University. In May 2003, he took on the additional role of forensic investigator for the District Six Medical Examiner's Office (the Florida counties of Pinellas and Pasco). After a few months, he quit working and focused on his schoolwork. In June 2004, he completed his master's in criminal justice and that same year completed 112 hours of law enforcement officer training at "St. Pete College."

¶ 16    With those credentials, Marcano applied to work for the Hillsborough County Sheriff's Office. Marcano's brother was a Hillsborough County deputy sheriff at the time and told Marcano that the sheriff was hiring.

¶ 17    In his two employment applications, Marcano stated why he left prior jobs. He attributed his departure from the Harvey police force in 1998 to his "Inability to tolerate cold weather and hairing [(*sic*)] impairment resulting from line of duty GSW [gunshot wound] to head." Elsewhere on the form, Marcano disclosed that in April of 1999, he "was given line-of-duty disability from the Harvey Police Department," but he did not specify why the pension board determined that he was disabled from police work. He wrote that he quit his subsequent paramedic position at the Chicago Fire Department due to an "Inability to tolerate cold weather resulting from GSW to head." Those were, however, Marcano's last indications that he had any difficulty with cold weather or was hearing impaired. With respect to his next job, the insurance surveillance job that was based in Altamonte Springs, Marcano wrote that he quit due to the "Displeasure of constant travel and cost of maintenance of personal vehicle." The reason he gave for leaving his next job in Clearwater was simply "Relocation." He also wrote about moving back to Illinois for work and school, but he did not indicate that he had any concerns about the northern climate and his hearing impairment. More specifically, he wrote that he lived in Dolton from February 2001 to May 2003 (for approximately two years). His reason for leaving the security and investigative position with Countrywide Detective Agency in 2001 was that the job "Interfered with schooling. Desire to start my own company." His self-employment in his Burnham-based company, Special Investigation Services, ended because he "closed [the] business," but his other business, Elite Security Services, was ongoing in Chicago. "Relocation" was his stated reason for leaving Daley's Ambulance in Dolton and Eagle Investigations and Security in Oak Lawn, both in 2003.

¶ 18    On November 20, 2004, as part of the deputy application process, Marcano underwent a pre-employment polygraph examination. The polygraph examiner reported Marcano's response to

questions about his health:

> "Medical: He is in good health. The last time he saw a medical doctor was about two years ago for an illness. He was hospitalized in 1/98, when he was shot in the shoulder and the face in the line of duty. He spent four days in the hospital. He was also readmitted the same year to have post surgery done to his shoulder and was kept overnight. The only broken bone[s] he had [were] his right shoulder when he was shot in [1998], and his jawbone when he was shot in the face. He has had a full recovery and no problems since. *** The only other medical condition he has is a slight loss of hearing in his right ear, caused when he was shot in the face."

¶ 19    In other words, Marcano's permanent hearing loss was now only "slight" and he had no other lasting medical effects from either of the gunshot wounds. The report concluded, "In the opinion of the examiner of the polygraph test conducted, Marcano did not display reactions of a deceptive nature to the main issue questions."

¶ 20    Marcano's pre-employment evaluation included a physical examination by a physician with the Florida Department of Law Enforcement. The report form instructed the examining physician as follows:

> "The examination of this applicant for a law enforcement, correctional, or correctional probation officer must include a complete physical examination at a level of specificity to determine whether there is any medical or physiological reason that may impair the applicant's ability to perform the essential functions of the position for which he or she has been conditionally selected. Disabilities, impairment, or limitations identified by the examination, which would prevent the applicant from performing the essential functions

or the position, should be reported to the employing agency."

¶ 21    The physician reported, "GSW @ shoulder well healed surg. scar & deficits," but did not indicate that Marcano had any hearing loss. The examination form required the physician to attest that he or she had examined the applicant and found the applicant to be either capable or not capable of performing the essential functions of the officer position. Marcano's examining physician attested that Marcano was capable of the job.

¶ 22    The Hillsborough County sheriff conditionally hired Marcano as a law enforcement deputy as of July 5 or 25, 2005, at an annual base salary of $79,039 (both July dates appear in the record on appeal).

¶ 23    Marcano was questioned by the pension board about his experience as a Hillsborough County sheriff's employee. He testified that he was never placed on restricted duty on account of any hearing loss and there is no indication that he asked for an accommodation. Instead, he performed the normal and full duties of a sworn police officer, including spending the first seven months on active patrol with a field training officer, where his tasks included making arrests. After the training, he was assigned to the community resource section. He worked in a substation in a Spanish-speaking community where he handled complaints about neighbors who were noisy, drinking, and so forth. Marcano was chosen for this position because of his fluency in Spanish and his master's degree in criminal justice. In 2009 or so, he was assigned to the selective enforcement unit, where he worked in plain clothes surveilling priority or prolific offenders and making arrests. In September 2015, he was promoted to law enforcement detective and was employed in this capacity a year later when he testified.

¶ 24    During his employment by the sheriff, Marcano received 21 certificates of commendation

for exemplary police work. In 2006, for instance, he was commended for his arrest of a burglary suspect which led to the arrest of three other suspects in the same "very active" burglary ring. In 2006, he also received a commendation for locating a convicted felon who was a suspect in a vehicle burglary. Marcano was commended numerous times over the years for identifying and addressing gang activity. In 2014, he was nominated for his district's "Eagle Eye" award for his response to a residential burglary in progress and successful pursuit of the fleeing suspects, one of whom was considered to be a "Prolific Juvenile Offender." Other commendations in 2014 came about because he was a conscientious and compassionate officer. He was commended for his "professionalism and empathy" during a suicide investigation and later that same year was commended for having a "reflective and insightful" conversation with a "rebellious teenager" that was likely a "turning point" in the young man's life.

¶ 25    Marcano suffered on-the-job injuries while he was employed by the sheriff. In January 2006, he hurt his left knee while pursuing a suspect. The department's "Description of Accident Form" that he signed states that while responding to a 911 call, he "ran out of the door of the residence to assist another unit on a foot pursuit" and then "tripped over some landscaping and fell to the ground," striking his left knee on "either a landscape block or a stone." In an "Incident Report" that Marcano prepared about a one-car accident in December 2006, Marcano stated that after he arrived at the scene, the driver admitted fault, then fled on foot. "Writer gave chase on foot. Writer was in full uniform and announced his office several times as he ordered the defendant to stop running. Writer chased the defendant for 20 minutes and repeatedly advised *** to quit resisting. Writer found the defendant hiding in some bushes and took him into custody." During the foot chase on uneven ground, Marcano had injured his left foot to the extent that he was placed

on medical leave. In 2007, Marcano suffered a rope burn and was exposed to contaminants in a 15-foot-deep retention pond after he and others jumped into the water at nearly midnight to rescue the driver of a submerged car that had been flung into the retention pond by the force of a two-car collision. The driver was found and transported in critical condition. In 2010, Marcano reinjured his left foot when he jumped off of a police utility vehicle while executing a search warrant. In November 2011, he was involved in an on-duty vehicle accident that damaged his right rotator cuff (the same shoulder that had been shot in 1998). The passenger side of his undercover car was "T-boned" by a car that ran a red light. Marcano required two surgeries and was off work for 10 months. When he was discharged from physical therapy in 2014, he noted "My shoulder feels great" and his orthopedic physician wrote "He states that the physical therapy has helped him tremendously. He states that all of his pain is gone, although he still feels some 'twinges' at time[s]." In all of the instances that Marcano suffered on-the-job injuries, he recovered and returned to full and unrestricted duty as a sheriff's deputy or detective. Marcano was still employed by the Florida sheriff through the date of the pension board's decision and order on January 15, 2020.

¶ 26    Prior to the administrative hearing, the pension board retained Daniel G. Samo, M.D., to review Marcano's medical records and opine whether he remained disabled and eligible for a pension. Dr. Samo was the Medical Director of Corporate Health for Northwestern Memorial Hospital, an Assistant Professor at the Northwestern University Feinberg School of Medicine, the Chair of the Public Safety Medicine Section of the American College of Occupational and Environmental Medicine ("ACOEM"), and the Chair of the ACOEM Task Force on Medical Guidance for Law Enforcement Officers. That task force wrote the ACOEM's *Guidance for the*

*Medical Evaluation of Law Enforcement Officers* and Dr. Samo was the principal author of the chapter about hearing. The hearing chapter was given to one of Marcano's medical experts (Ryan R. Williams, M.D., Ph.D.) who relied on those guidelines when formulating his opinions.

¶ 27    Dr. Samo reviewed Marcano's medical records from Brandon Family Medical Center dated March 12, 2008 through November 3, 2015; Florida Orthopedic Institute dated August 30, 2010 through November 6, 2014; Sports Medicine Clinic of Tampa dated November 18, 2011 through April 30, 2012; and Burns Family Chiropractic Center dated November 25, 2013 through April 15, 2016. Dr. Samo prepared a report to the pension board on June 8, 2016, which included a detailed chronological account of the medical records and his findings based on his review of those records. Dr. Samo noted that Marcano had a history of gunshot wounds to his right shoulder and ear and "some degree of residual problem with the shoulder for several years, but it then returned totally to normal and he had had no ongoing problems." The records also disclosed that Marcano had injured his left foot while jumping from a height of about three and a half feet while executing a search warrant and was seen for shoulder pain following an auto accident that occurred while he was in an undercover role. There was no indication in Marcano's medical records that he suffered from any hearing loss, sensitivity to cold, or other issues stemming from being shot in 1998.

¶ 28    Based on Dr. Samo's review of the medical records, he opined that Marcano "is not disabled and can perform the essential job tasks of a police officer." (We reiterate that section 3-116 of the Pension Code, quoted above, provides that if the police officer "is found upon medical examination to have recovered from disability, the board shall certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position." 40 ILCS 5/3-

116 (West 2016)). Dr. Samo explained that "a[t] least as far back as 4/25/08 [Marcano] was working as a police officer for the Hillsborough County Sheriff's Office," that his "7/20/10 foot injury" occurred "while executing a search warrant," and his "11/11/11 shoulder injury occurred while he was working as an undercover police officer for the Hillsborough County Sheriff's Office." Dr. Samo also noted that Marcano "had been released back to full duty on 9/8/12 and at his visit with Dr. Mighell on 11/15/12," he reported that "he was working at his job with no problem" and "he has remained on unrestricted full duty since then." Dr. Samo concluded his report by stating that although the records he reviewed "do no elucidate the specific reason for [Marcano's] disability, it is apparent that he has been working without restrictions as a police officer since at least 2008." "Thus, since he has been doing the job of a police officer for at least the past 8 years, he is obviously no longer disabled from policing."

¶ 29    On December 19, 2017, after the administrative hearing had commenced, the pension board obtained Marcano's entire personnel file from the Hillsborough County Sheriff's Office and Marcano produced additional medical records. The board asked Dr. Samo to review the new materials. Dr. Samo subsequently reported on January 1, 2018 that because he was not provided with any information about the basis for the original disability award, he was unable to say that Marcano "recovered from this disability." However, Dr. Samo stated, "at this time, I do not see any medical condition which would cause [Marcano] to be disabled from full police duties." Dr. Sano explained that, as he had found in his earlier report, Marcano "had been working as a police officer in Florida since at least 2008" and that "since he had been doing the job of a police officer for at least the prior eight years, he was obviously not disabled for performing policing duties." Dr. Samo deduced, "whatever had caused him to be disabled from Harvey, must have improved

sufficiently to allow him to return to policing."

¶ 30    With respect to Marcano's hearing loss, Dr. Samo opined:

"There also seems to be some issue about his hearing and whether this could be a cause for disability. He clearly has a significant hearing loss in his right ear, while the hearing in his left ear is normal. Current guidance states that if the average pure tone threshold at 500, 1000 and 2000 Hz in the better ear is greater than 40 dB, then restrictions would be required. In his most recent test, his better ear (the left ear) had a threshold average of 23.3 dB and he would therefore not need restrictions based on this. The issue of asymmetric hearing loss is addressed by job performance, and based on the multiple commendations and his ongoing tenure as a police office[r] in Florida, it does not seem that he was having any performance issues due to his hearing. Thus, my opinion would be that he is not disabled due to his right ear hearing loss."

¶ 31    Following the submission of Dr Samo's second report, Marcano obtained contrary opinions from four physicians. All of the reports attribute his disability to his hearing loss and did not indicate that a sensitivity to cold was disabling.

¶ 32    Three of the physicians simply made a tick mark on a "Physician Certificate" form to indicate that Marcano was "disabled," and attached a one-paragraph explanation for this conclusion. Two of the explanations were nearly word-for-word identical. In the first one, Scott D. McNaughton, M.D., wrote on February 12, 2018:

"To Whom It May Concern:

Mr. Marcano was seen on this date concerning prior catastrophic injuries sustained while on duty with the Harvey Police Department January 22, 1998. Patient continues to

have hearing loss of the right ear and some associated dysequilibrium due to the hearing loss that is evident with eyes closed or dark room. Audiology testing performed August 15, 2016. There is no less than 86.25 dB hearing loss of frequencies tested on the right ear. The degree of hearing loss is not expected to improve and his disability is permanent. Patient also has had recurrent pain of the central forehead and face with cold environments secondary to the facial injuries from the gun shot wound sustained to this area."

¶ 33    Five weeks later, on March 23, 2018, Carlos Mella-Picel, M.D., wrote:

¶ 34    "To whom it may concern,

Mr. JJ Marcano was seen on 3/23/18 concerning prior catastrophic injuries sustained while on duty with the Harvey Police Department January 22, 1998. Patient continues to have hearing loss of the right ear and some associated dysequilibrium due to hearing loss that is evident with eyes closed or dark room. Audiology testing performed February 12, 2018. There is an average loss of 86.25 dB at frequencies tested on the right ear. The degree of hearing loss is not expected to improve and his disability is permanent. Patient has also had recurrent pain of the central forehead and face with cold environments secondary to the facial injuries from the gun shot wound sustained to this area."

¶ 35    Daniel Montalvo, M.D.'s completed "Physician's Certificate" on February 12, 2018 was attached to a handwritten note on his office's letterhead, in which Dr. Montalvo stated:

"To whom it may concern:

Mr. Moreno s/p gunshot while on duty as a Harvey Police Officer 1/22/98. Mr. Moreno sustained hearing loss and ringing right ear. Also has problems with his balance especially when closing his eyes. Mr. Marcano is permanently disabled."

¶ 36    The fourth opinion was from Ryan R. Williams, M.D., Ph.D. Dr. Ryan was the Chief Medical Officer of the Santa Monica, California based SAFE Group, Inc. and "Part-time Faculty, Neuroscience and Physiology, UCLA Extension Los Angeles, CA." Dr. Ryan's August 24, 2018 report was based on an 11/24/14 CT scan of Marcano's temporal bones, an 8/15/16 audiogram, and the hearing chapter of ACOEM's *Guidance for the Evaluation of Law Enforcement Officers*, principally authored by the pension board's expert, Dr. Samo. Based on Dr. Ryan's review of these records, he opined that Marcano "has severe to profound hearing loss in his right ear that is both sensorineural and conductive in nature and caused by his gunshot wound in 1998." Dr. Ryan said that "based on the criteria listed by the Task Force and hearing thresholds from the listed law enforcement agencies in the ACOEM's most current guidelines, I must concur that Officer Marcano clearly does not meet the hearing standard requirement." Dr. Ryan noted that "[t]he presence of the bullet fragments adjacent to the right facial nerve, a major sensory nerve, likely causes his cold intolerance on the right-side of his face," but Dr. Ryan did not indicate that this condition prevented Marcano from performing the duties of a Harvy police officer.

¶ 37    On November 1, 2018, Dr. Ryan issued an "ADDENDUM" in which he reviewed a more recent CT scan of Marcano's temporal bones and reiterated his opinion that Marcano "has a permanent, severe to profound hearing loss in his right ear []due to his gunshot wound in 1998."

¶ 38    Marcano also submitted a "report" from Hilary A. Marusak, a Ph.D. in neuroscience who was working as a postdoctoral research fellow in the department of pharmacy practice at Wayne State University. Dr Marusak submitted a one-page discussion about "Cold allodynia and hyperalgesia (i.e., cold intolerance)." Dr. Marusak did not mention Marcano, discuss his injuries or disabilities, conclude that he was suffering from "cold allodynia and hyperalgesia," or opine

that he was disabled in any way from serving as a Harvey police officer.

¶ 39 None of Marcano's five experts indicated that he or she was aware that Marcano had been working without restriction as a deputy sheriff for the past decade. The board did not know of the doctors' reviews until after they were completed. In other words, the board did not have the opportunity to send any information to Marcano's personally-selected doctors and it was unclear what information was given or possibly withheld from those individuals.

¶ 40 Marcano also gave the board a letter written by Retired Colonel Ronald C. Hartley of the Hillsborough County Sheriff's Office on July 18, 2018. Marcano had been hired by the sheriff's office, completed his field training, and then assigned to District Four. Colonel Hartley wrote in relevant part:

> "Deputy Marcano was assigned to District Four, which was my District. Upon his transfer there, I read his personnel records in detail as I did on all rookies assigned to me. From his official records I learned he had prior law enforcement from a northern department and had been shot while on duty, suffering a gunshot head injury which led to a hearing disability.
>
> I can attest to the fact the Sheriff's Office hires on the basis of the best person available for the job. The criteria for hiring is education, past experience, maturity and physical fitness. If an individual can meet the standards of the Sheriff's Office they will be considered for employment and put before a selection committee. Deputy Marcano would be considered an outstanding candidate for hire due to his education, Spanish speaking ability, prior law enforcement experience, and his Florida State Law Enforcement Certification. Deputy Marcano not only met the minimum qualifications at that time but exceeded many of these qualifications.

* * *

The Hillsborough County Sherriff's Office hiring standards are very exacting, however, it is not so unusual to hire or retain a person with a disability if they appear to be the best candidate. The HCSO usually has 8 to 10 times the number of job applicants to the number of job openings."

¶ 41 Although Colonel Hartley indicated that Marcano had been knowingly hired with a hearing disability, Colonel Hartley did not mention that Marcano's personnel records included his polygraph examination report disclosing that he told the Hillsborough County Sheriff's Office that he "had a full recovery and has had no problem since" he suffered the gunshot wound and that he only had "a slight hearing loss in his right ear." Also, Colonel Hartley also did not indicate that Marcano's assignments were modified because of his hearing impairment.

¶ 42 After the board entered its adverse decision and order and Marcano sought administrative review, the circuit court ordered the board to have its medical expert, Dr. Samo, perform a physical examination of Marcano. Dr. Samo performed the in-person exam on August 17, 2021 and submitted his report a week later. He had reviewed Marcano's five expert reports and a more recent CT scan that Marcano gave to him. Dr. Samo's follow-up report included Marcano's relevant medical history:

"He stated that he was shot at three times, the first entered his right shoulder, the second missed him and the third entered on the left side of his nose and traveled to the right mastoid area. He had several surgeries, one to the nose and mouth, also to the right shoulder and eventually to the right ear/mastoid. He stated that on discharge from the hospital he had significant imbalance and needed to use a cane. This improved significantly after the

surgery to his ear. He also had been given a hearing aid which made everything worse in that it made some things too loud and due to poor fit he had a lot of whistling due to feedback. He returned to work at Harvey Police about three months after the event. He continued to work until about September 1998 at which time he changed jobs (he had been planning this before the gunshot) to begin at Chicago Fire Department as a paramedic."

¶ 43    Examining Marcano in person and reading the additional expert reports did not affect Dr. Samo's conclusions: "My opinions as stated in my reports of 6/18/16 and 1/1/18 are unchanged by the additional records or the history and physical I performed."

¶ 44    As for Marcano's hearing loss, Dr. Samo acknowledged that the audiogram he performed during his physical exam "continues to show profound hearing loss in the right ear, which is essentially unchanged," but he disagreed with the experts who had found that the hearing impairment disabled Marcano from police work. Dr. Samo stated that he had the expertise to critique the other opinions because he was "the founder (2003) and current chair of the ACOEM task group that writes *ACOEM's Medical Guidance to the Evaluation of Law Officers*" as well as the principal author of the chapter about hearing.

¶ 45    Dr. Samo pointed out that two of Marcano's experts, Drs. McNaughton and Mella-Picel "have essentially identical reports" and he stated, "I am finding it hard to understand how two examiners who did IMEs (INDEPENDENT Medical Exams) on separate dates would have identical reports." Dr. Samo also pointed out that these two experts had misinterpreted Marcano's audiogram results:

"They also both stated that there was 'no less than 86.25 dB hearing loss of frequencies tested on the right ear.' I was finally able to figure out that this number was derived as the

average of the readings of the right ear at 3000, 4000, 6000 and 8000 Hz in the audiogram done on 8/15/16. This is a totally inappropriate use of the numbers from the audiogram to evaluate for a law enforcement officer's fitness for duty. The correct numbers to use are the average of the reading at 500, 1000 and 2000 Hz."

¶ 46   As for Dr. Williams, Dr. Samo opined that this expert had misinterpreted Marcano's test numbers:

"Dr. Williams stated in his report that the results of the audiogram exceed ACOEM's definition of asymmetrical hearing loss. This would be incorrect. The ACOEM document does not define asymmetrical bearing loss, but rather references a 1979 definition from the American Council of Otolaryngology. The document goes on to say that the impact of asymmetrical hearing on performance of EJTs (essential job tasks) by the LEO is not clear. Thus if there is any question that asymmetrical hearing loss is affecting job performance, then functional testing needs to be done. An LEO cannot be found unfit due to asymmetrical loss based solely on audiogram results."

¶ 47   Dr. Williams had not, however, obtained functional testing. Dr. Samo explained:

"ACOEM's Guidance states that if the average pure tone threshold at 500, 1000 and 2000 Hz in the better ear is greater than 40 dB, then restrictions would be required. In all of Mr. Marcano's audiograms, including the one done today, his better ear does not have an average loss of > 40dB, and he would therefore not need restrictions based on this. The issue of asymmetric hearing loss is addressed by job performance and based on the multiple commendation and his ongoing tenure as a police officer in Florida, it does not seem that he was having any performance issues due to his hearing. Thus, my opinion is unchanged

and I believe that he is not disabled due to his right ear hearing loss."

¶ 48    Having summarized the facts that were available to the pension board, we will briefly summarize the procedural history. Going back to the beginning of the administrative proceedings, the first hearing was on August 22, 2016. By that time, the pension board had obtained Dr. Samo's June 8, 2016 initial report. Marcano was the only witness and he admitted that he had been working as a sheriff's deputy in Hillsborough County. At the conclusion of the hearing, it was agreed that the pension board would obtain Marcano's complete employment file from the Hillsborough County Sheriff's Office and reconvene the hearing at a later date. A motion was made to temporarily suspend Marcano's disability payments on an interim basis, subject to restoration if it was determined at the conclusion of the hearing that Marcano remained disabled and unable to serve as a Harvey police officer. Neither Marcano nor his counsel, who were present when the motion was made, objected to the motion or sought a continuance. After a short discussion, the pension board voted in favor of the motion and the disability pension was suspended.

¶ 49    A second hearing was held on November 8, 2018. Marcano had obtained reports from his five experts and these reports were admitted into evidence. The pension board also obtained approximately 800 pages of employment records from the Florida sheriff and a supplemental report from Dr. Samo, which were also admitted in evidence. Marcano testified again and then rested. Marcano's attorney made a closing argument and the hearing was adjourned and continued without a decision because there was no audiotape to record the board's executive session.

¶ 50    A third hearing was held on June 19, 2019, but the board was understaffed at the time and only three members were in attendance. Also, the Harvey police chief who was expected to testify had recently resigned and was not available. Because of the lack of a quorum and the need for the

new police chief's testimony, the hearing was continued to the next earliest date.

¶ 51     On July 22, 2019, six months before the board would complete the administrative hearing and issue its final decision and order, Marcano filed suit against the board in the circuit court of Cook County, but he did not serve the complaint. Count I was a section 1983 claim (42 U.S.C.A. § 1983 (2018)) in which Marcano alleged he had been deprived of due process when the board—without issuing a final decision—interrupted the pension benefits that it had issued to him for 18 years. Count II sought a writ of *mandamus* to prevent the board from obtaining further evidence, require it to render a decision, and oblige it to award approximately three years' worth of disability pay that had been "wrongfully terminated [in 2016] prior to a final administrative decision." In Count III, Marcano sought a declaratory judgment that the board lacked statutory authority to suspend benefits pending a full hearing and final decision, and that the board was enjoined from gathering further evidence and must award the disability pay that accrued between its interim and final determinations.

¶ 52     A fourth and final board hearing was convened on August 27, 2019. Harvey police chief Eddie Winters testified that if the pension board were to determine that Marcano had recovered from his disability and could return to full and unrestricted police duties, then Marcano would be rehired by the Harvey police. Chief Winters also testified that Marcano's assigned position would be compatible with whatever accommodation he required. After an executive session, the five members of the pension board unanimously voted and found that Marcano had recovered from his disability and was able to return to his full-time unrestricted duties as a sworn Harvey police officer and to terminate his benefits retroactively.

¶ 53     The pension board issued a written decision and order on January 15, 2020, finding by the

preponderance of the evidence that Marcano had recovered and could resume the duties of his position in Harvey, and that the disability pension was terminated effected August 22, 2016.

¶ 54    On February 6, 2020, Marcano filed a three-count "First Amended Complaint" that was served on the board. This pleading was identical to his prior pleading, other than replacing the *mandamus* claim with an administrative review claim.

¶ 55    The board moved to dismiss the civil rights and declaratory judgment claims on grounds that these claims exceeded the limits of the administrative review law.

¶ 56    The circuit court entered and continued the board's motion and ordered the parties to brief the administrative review claim.

¶ 57    After considering the parties' written briefs and oral arguments, the circuit court ordered the board to have its medical expert examine Marcano in person and provide the court with an explanation of its decision to temporarily suspend the disability benefits.

¶ 58    Once Dr. Samo conducted the physical examination and issued his updated report, the board met and unanimously voted that Marcano had recovered and was eligible to resume service with the Harvey police force. Following the board's oral vote on January 18, 2022, the board issued a written "Supplemental Decision and Order" on February 2, 2022, in which the board took into consideration Dr. Samo's updated report and the board again found that Marcano was recovered and was capable of resuming police work in Harvey. The board also reaffirmed its decision to terminate the pension effective August 22, 2016, reasoning that continuing to pay disability benefits to a former police officer who testified that he had been taking those benefits for over a decade while performing the duties of a police officer in another jurisdiction would be in breach of the board's fiduciary duty to preserve the pension fund's assets for the benefit of all qualified

participants and beneficiaries.

¶ 59    On February 14, 2022, Marcano died from a COVID-related illness, survived by his wife, daughter and son.

¶ 60    With leave of court, Marcano's wife, Delfina Marcano, in her capacity as the independent executor of his estate, was substituted as the plaintiff and filed a second amended complaint which was materially the same as the first amended complaint, other than substitution of plaintiff.

¶ 61    The board refiled its motion to dismiss all but the administrative review claim, and after briefing, an agreed order was entered dismissing the extraneous counts with prejudice. The court also ordered the parties to brief the administrative review claim, heard oral arguments, and then affirmed the board. This appeal followed.

¶ 62    On appeal, the estate argues that the board's finding that Marcano recovered from his disability was against the manifest weight of the evidence when *Martino v. Police Pension Board of the City of Des Plaines*, 331 Ill. App. 3d 975, 980 (2002), indicates that the board was required to affirmatively show by "medical examination" that Marcano had "recovered" from the disability for which he was awarded a disability pension and the board did not meet this burden; given that the record indicated he was disabled by a permanent hearing loss and intolerance to cold. The estate also relies on *Martino* for the proposition that Marcano's employment by another law enforcement agency was not a basis for suspending his disability benefits.

¶ 63    In our opinion, although it is undisputed that Marcano's on-duty injury in 1998 caused him to suffer a permanent, partial loss of hearing in his right ear, the board's finding that Marcano had learned to accommodate that loss and could work competently as a full-time, unrestricted police officer, was overwhelmingly supported by the manifest weight of the evidence. The evidence

indicated that after Marcano left the Harvey police force, he worked in Illinois and Florida as a security officer, investigator, paramedic, and police officer, including more than 16 years in Florida as a full-time sheriff's deputy and detective for the Hillsborough County Sheriff's Office, from July 2005 until his death in February 2022.

¶ 64    The record from the original administrative proceedings was no longer available, but Marcano testified that the pension board's disability finding was based on his hearing loss. More specifically, the following exchange between the hearing officer and Marcano occurred during a hearing in September 2016:

"Q: Now, what is your understanding of the reason the Board gave you benefits – this Board gave you line-of-duty disability benefits?

A. The main reason is my hearing."

¶ 65    Later during the same hearing, Marcano suggested that he could not return to "full unrestricted job duties" in Harvey due to his hearing loss, "problems *** with cold weather due to *** damage to [his] skull," and "to a certain extent [his ability to] balance" when he closed his eyes, such as when he shampooed his hair. However, one of the board members followed up by questioning Marcano specifically about the reason he was awarded a disability pension:

"Q. Officer Marcano, so you're saying that you are getting-you think you're getting disability because of your-you can't handle the cold and what other reason?

A.  No. No. The hearing loss I believe is the primary reason."

¶ 66    The board member repeated, "Hearing loss?" and Marcano responded affirmatively.

¶ 67    Moreover, it seems unlikely that the board's original disability determination was based on cold sensitivity, given that after being granted the pension, Marcano lived, worked, and attended

college in the same northern climate for years. In addition, no one, not even Marcano's experts, opined that Marcano was disabled by his alleged inability to withstand cold weather. Marcano submitted Dr. Marusak's one-page general discussion of allodynia and hyperalgesia in patients with neuropathic pain, but there was no mention of Marcano in the discussion and Dr. Marusak, a postdoctoral research fellow at a Michigan university, did not make a medical diagnosis or opine that Marcano suffered from a condition that disabled him from police work. Some of Marcano's other experts mentioned cold in their reports, but none of them diagnosed Marcano with a disabling condition of intolerance to cold. The pension board apparently did not find Marcano's testimony about the basis for his original disability determination to be credible, and there is competent evidence in the record to support the board's conclusion. See *Evert*, 180 Ill. App. 3d at 660 (since the weight of the evidence and credibility of the witnesses is determined by the board, there need only be some competent evidence in the record to support its findings).

¶ 68    Also, the issue before the board was not whether Marcano was still suffering from the hearing loss, but whether that hearing loss would prevent him from resuming the duties of a Harvey police office.

¶ 69    " 'Disability' " is defined in the Pension Code as "A condition of physical or mental incapacity to perform any assigned duty or duties in the police service." 40 ILCS 5/5-115 (West 2020). Marcano's employment during the past two decades demonstrated that he no longer suffered from a "condition of physical *** incapacity to perform any assigned duty or duties in the police service." *Id.*

¶ 70    The record presented to the board established that Marcano was able to work in Illinois as an EMS coordinator and then EMS lieutenant for the Dolton Fire Department; held a paramedic's

position at Daley's Ambulance in Dolton; and was a security officer and chief detective for Eagle Investigations & Security in Oak Lawn. He was also able to work in Florida, as an investigator for Gryphon Specialty Services in Altamonte Springs, and as a community security officer, sergeant, and staff sergeant for Critical Intervention Services in Clearwater. There is no indication in the record that he asked for or needed any accommodation for his hearing loss from any of these employers. The estate argues that Colonel Hartley's statement was disregarded, but the statement of this retired police official indicates only that Marcano was knowingly hired with a hearing impairment, not that he requested or was given an accommodation on account of a disability. We reiterate that the record does not indicate that Marcano sought an accommodation or was given an accommodation by any of the entities that employed him after he left the police force in Harvey. Marcano also worked in similar capacities for two of his own companies in Illinois. He worked at his Burnham-based business, Special Investigation Services, from April 2002 through April 2003, assisting custodial parents in locating and obtaining child support payments from noncustodial parents. This job overlapped with his other self-employment at Elite Security Services, from April 2002 through April 2004, which was his Chicago-based on-site security firm. Both jobs were similar to the normal duties of a sworn police officer and it appears that Marcano performed well in these capacities.

¶ 71    Marcano himself realized that performing police service duties would jeopardize his disability pension. In the employment history that he gave to the Hillsborough County Sheriff's Office, Marcano stated that the reason he left his community-based security job at the Clearwater firm in 2000 was because "similar duties jeopardized my disability statutes with Police Dept." In the narrative summary of his employment history, he also explained that he left the job in

Clearwater because "[s]imilar duties threatened my disability status with police department so I decided it was in my best interest to go back home to Chicago in February of 2001. I was homesick and wanted to be taken off disability at the Police Department so I could be reinstated."

¶ 72    The record also shows that after he was hired as a law enforcement deputy in the Tampa area in 2005, Marcano had full arrest powers and functioned without seeking or needing accommodation for a disability. Although Marcano seemed to shade his testimony to the pension board at times to suggest that he was "Disabled" (stating, *e.g.*, "I'm having a hard time hearing you even though I'm looking right at you because of the echo."), he admitted that he never asked to be placed on restricted duty and was never placed on restricted duty by the Hillsborough County sheriff. There is nothing in the extensive record that was obtained from Marcano's long-term Florida employer that even remotely hints that he was ever afforded any special assignment or treatment because of a disability. Instead, the record discloses that Marcano told the Hillsborough County Sheriff during a pre-employment polygraph examination that "he had a full recovery" from his 1998 gunshot wounds and had "no problems since" other than "a slight loss of hearing in his right ear." Marcano also testified that the Hillsborough County sheriff never tested his hearing. Furthermore, Marcano's attempt to suggest while testifying that he was afforded special treatment and just worked in an office (*e.g.*, "I don't have the frontline position. I don't answer the radio and be (*sic*) in charge of the calls."), was contrary to his Hillsborough County employment record. Immediately after he was hired, Marcano spent seven months on active patrol in field officer training and was making arrests and performing all of the full unrestricted duties of a police officer. After completing his training, Marcano was assigned to the community resource section of the sheriff's department, working in a Spanish-speaking community. Marcano was chosen for this

assignment not because he was being accommodated due to a disability, but because he was fluent in Spanish and had a master's degree in criminal justice. His next assignment was with the selective enforcement unit, where he conducted surveillance of priority or prolific offenders and made arrests. In September 2015, Marcano was promoted from deputy to detective, and assigned to the intelligence division. One of the documents that Marcano produced to the pension board was a Hillsborough County document entitled "Standard Operating Procedure." On the page regarding "Duties and Responsibilities of Special Investigations Division: Tactical Intelligence Section," Marcano's stated duties include to utilize intelligence reports regarding a high priority crime location and then to "Conduct tactical operations to infiltrate gang, drug and vice cultures in and around the targeted location to gather intelligence consistent with the control strategies and established intelligence requirements." The latter part of this description indicates that the tactical intelligence section was not a sedentary, quiet desk job.

¶ 73    The pension board's decision is also supported by the fact that while Marcano was employed by the Hillsborough County Sheriff's Office, he received numerous commendations for model, admirable police work. These included commendations for arresting a residential burglary suspect, tracking down a convicted felon suspected of vehicle burglary, responding to a burglary in-progress call and then pursuing and capturing the suspects, identifying and preventing gang activity and juvenile trouble during the Florida State Fair, and attempting to resuscitate a person who was dying by suicide. In addition, he was nominated more than once for his district's "Eagle Eye" award, including when he pursued and stopped a driver suspected of shooting into another vehicle and then, minutes later, going to a bar and shooting someone there. Furthermore, due to Marcano's active, unrestricted police work, he suffered significant on-duty injuries. He injured his

left knee while running after a suspect; injured his left foot during a 20-minute foot chase in full uniform; reinjured his left foot by jumping off a tactical police vehicle while serving a search warrant; suffered a rope burn to one hand and was exposed to the contaminants in a retention pond when he jumped in and searched for a driver trapped in their submerged vehicle; and reinjured his right shoulder when he was involved in a motor vehicle accident while undercover.

¶ 74    The estate argues that Marcano's work history is irrelevant because he still suffered from the same disability that he was suffering from when he was awarded the disability pension. The estate bases this argument on *Martino*, 331 Ill. App. 3d 975. In *Martino*, the plaintiff was hired by the police department of Des Plaines, Illinois and, a few months later, ruptured two disks in his lower back. *Martino*, 331 Ill. App. 3d at 977. Because of the injury, he developed a symptom called foot drop that prevented him from running. *Id.* He had to use a brace and wheelchair and lacked control of his bladder. *Id.* The pension board found that the officer's "conditions prevent him from performing the duties of a police officer because of the lack of ambulatory ability" and it granted a nonduty disability pension in the amount of 50% of his salary. *Id*. After that, "the Des Plaines police department terminated [the officer's employment] because of his physical disability." *Id*. Two years later, he was hired as a full-time police officer for Lake Villa, Illinois, and upon learning of his employment, Des Plaines ordered its former employee to show cause as to why his pension should not be revoked. *Id*. During the show cause hearing, he provided two physician's certificates confirming that he still had the same foot drop that led to his dismissal from the Des Plaines police force. *Id*. One doctor said the former officer " 'has difficulty running and wears a brace on his right leg' " and the other doctor said, " 'He cannot run at any speed or distance due to his right foot brace. His injury and disability is permanent.' " *Id*. In addition, he testified that when he was

employed by Des Plaines, he was told that he would have to be able to run as a condition of his employment. *Id*. at 979. The pension board presented no contrary medical evidence indicating that the former employee was not disabled and it agreed that he continued to suffer from the disability. *Id*. at 977, 980. As long as he was in that state, he would not be rehired by the Des Plaines police department. *Id*. at 981. Nevertheless, the board revoked the pension due to his employment by the other community. *Id*. at 979. On administrative review, the circuit court reinstated the pension and the appellate court also found that the board erred in revoking the pension, given that he had not recovered from the disability. *Id.* at 979, 981. The appellate court also rejected the board's argument that "the combination of the two events (the receipt of a disability pension from one municipality and the securing of full-time police work in a second municipality) violates public policy." *Id.* at 982. The court reasoned:

> "We would agree *if* the officer's work in the second police department demonstrated his recovery from the disability that necessitated his termination from the first police department. Under the unique facts of this case, though, [he] was hired by a second, smaller police department though he continues to suffer from the same disability that prevents him from working for the first police department. As discussed earlier in this opinion, the second police department was aware of [his] continued disability, but hired him anyway because of his education and experience and because other officers were available to cover for him when necessary. Since [he] remains disabled from working for the first police department, his receipt of a disability pension from that department's municipality works no fraud or harm on the public welfare and thus is not violative of public policy." *Id.*

¶ 75    The court also found that his "work as a police officer in the second police department is

not inconsistent with his claim of disability, as all parties agree that plaintiff remains disabled from working for the first police department." *Id.*

¶ 76 *Martino*, thus, does not support the estate's appeal. The estate contends that there are "many parallels between the facts in *Martino* and this case," but we do not see any similarities. In contrast to *Martino*, the pension board did not concede that Marcano continued to suffer from a disability and would not be rehired by the Harvey Police Department. Also, unlike *Martino,* Marcano did not testify that, when he was employed by Harvey, he was told that he would have to have no hearing impairment as a condition of his employment. An additional contrast with *Martino* is that the former Des Plaines officer disclosed his disability and physical limitations to Lake Villa before Lake Villa hired him. Marcano, however, told the Hillsborough County Sheriff's Office that he had recovered from his gun shot injuries and suffered only a slight hearing loss, he did not seek and was not placed on any restrictions of duty, and no disability accommodation was made. Furthermore, there was competent medical and other evidence demonstrating that Marcano was no longer disabled from performing his duties as a police officer. That evidence included Marcano's 16-year history as a full-time unrestricted sheriff's deputy in Hillsborough County.

¶ 77 The estate cites *Martino* because the court construed language of the Pension Code, including section 3-116, which we quoted fully above and which states in relevant part, "If a police officer retired for disability, *** is found *upon medical examination* to have *recovered from disability*, the board shall certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position." 40 ILCS 5/3-116 (West 2016). The court read this in conjunction with other statutory language and concluded that a police officer's recovery from disability must be shown by medical examination. *Martino*, 331 Ill. App. 3d at 981. The

estate argues that that no "medical examination" ever showed that Marcano had "recovered from disability." More pointedly, Dr. Samo, the board's medical expert, was not provided with information about the basis for the initial disability finding and therefore could not state that Marcano "recovered" from that disability. Dr. Samo wrote:

"I do not have any information from the time of his disability application and award, and I do not know what the disability was based upon. Thus, I cannot say if he has recovered from this disability. I can say, that at this time, I do not see any medical condition which would cause him to be disabled from full police duties. *** [S]ince *** working as a police officer in Florida *** for at least the prior eight years, he was obviously not disabled for performing policing duties. Thus, whatever had caused him to be disabled from Harvey, must have improved sufficiently to allow him to return to policing."

¶ 78     The estate misinterprets *Martino*'s holding. Section 3-116 did not require that a "medical examination" be the pension board's *sole* basis for determining that Marcano recovered from his disability. 40 ILCS 5/3-116 (West 2016). Section 3-116 states only that there be a medical examination before such finding.

¶ 79     Moreover, the necessary finding of recovery from disability is to be made by the pension board, rather than an expert medical witness, as it involves the application of a set of facts to statutory language. See *Arient v. Alhaj-Hussein*, 2017 IL App (1st) 162369, ¶ 36 (neither an expert nor any other witness can tell the court how to interpret the law); *Todd W. Musburger, Ltd. v. Meier,* 394 Ill. App. 3d 781, 800-01 (no expert is allowed to opine about the law). The record indicates that the pension board considered all the evidence, including not only Dr. Samo's reports, but all the experts' reports, the testimony of the witnesses, and the voluminous other documents

on file. Unlike Marcano's medical experts, Dr. Samo had read all of Marcano's medical records and the reports of Marcano's medical experts, all of whom attributed Marcano's disability to his hearing loss, and Dr. Samo opined that "he is not disabled due to his right ear hearing loss." Also, although Dr. Samo acknowledged that he was not provided with any information about the basis for Marcano's original disability award, Dr. Samo found that "whatever has caused him to be disabled from Harvey, must have improved sufficiently to allow him to return to policing." He explained that he did "not see any medical condition which would cause [Marcano] to be disabled from police duties" and that "since he had been doing the job of a police officer for at least the prior eight years, he was obviously not disabled from performing policing duties." Thus, there was competent evidence supporting the pension board's conclusion that Marcano had recovered from the disability that warranted a pension in 1998.

¶ 80    The estate also cites *Martino* for the proposition that working for another law enforcement agency, while receiving disability benefits, does not establish that Marcano recovered from disability. The record does not show, however, that the pension board based its recovery determination entirely on Marcano's employment status or occupation. The fact of Marcano's employment by the Hillsborough County Sheriff's Office was just one of many facts before the pension board. The board considered extensive employment records which included Marcano's employment history dating to 1998, as well as witness testimony and numerous medical expert opinions.

¶ 81    For these reasons, we conclude that the board's decision was amply supported by the manifest weight of the evidence and was not contrary to decisional law or statutory language.

¶ 82    The estate's secondary argument is that the pension board violated Marcano's due process

rights by discontinuing his disability benefits before completing a hearing. The board responds that Marcano waived this argument, but his due process rights were not violated when he was given notice and opportunity to address the board's motion to temporarily suspend the pension payments based on Dr. Samo's initial report and Marcano's testimony about his employment in Florida. Marcano did not submit opposing medical evidence, argue against Dr. Samo's report or the board's proposed action, or request additional time to respond to the motion. Furthermore, the payments were not terminated in 2016, they were only temporarily suspended and were subject to reinstatement when the administrative proceedings concluded. The board also responds that suspending the payments after the first hearing was prudent in light of the board's fiduciary duty to ensure that adequate pension fund assets are available to all qualified pensioners.

¶ 83    We find that the due process argument has been waived. Marcano alleged in Count I of his Second Amended Complaint that his due process rights were violated because the pension board "deprived Marcano of his property interest of uninterrupted receipt of benefits." By agreed order, Count I was dismissed with prejudice. A dismissal with prejudice is the equivalent of an adjudication on the merits. *Van Slambrouck v. Marshall Field Co.*, 98 Ill. App. 3d 485, 487 (1981). "If a plaintiff by his deliberate and voluntary act secures the dismissal of his suit, he must be held to have anticipated the effect and necessary results of this action, and should not be restored to the position and the rights which he voluntarily abandoned." *Weisguth v. Supreme Tribe of Ben Hur*, 272 Ill. 541, 543 (1916). By agreeing to the dismissal of his due process claim with prejudice, Marcano abandoned any argument that his due process rights were violated.

¶ 84    Alternatively, Marcano had already waived this argument years before he got to the circuit court, in 2016, when he failed to object to the pension board's motion to temporarily suspend his

1-23-0579

pension payments. Generally, issues or defenses that are not raised before the administrative agency are waived and cannot be raised for the first time on administrative review. *Arvia v. Madigan*, 209 Ill. 2d 520, 526 (2004); *LaSalle Bank, N.A. v. C/HCA Development Corp.,* 384 Ill. App. 3d 806, 826 (2008) (a party's failure to object to an alleged error results in waiver of the issue on appeal); *Bert Jackson Motors, Inc. v. Chambers*, 114 Ill. App. 2d 209, 215 (1969) ("Interstate objects to evidence concerning attorney fees being heard by the jury. It would appear that this evidence should have been heard by the court. However, the only objection made to this evidence at the trial was that it was immaterial. Thus, Interstate has waived the objection it now seeks to make.") If Marcano had objected to the board's motion in 2016, the board would have had the opportunity to contemplate his reasoning and correct any error before it was raised on administrative review. See *Board of Trustees of City of Harvey Firefighters' Pension Fund v. City of Harvey*, 2017 IL App (1st) 153074, ¶ 235 (application of the waiver rule ensures that the trial court has the opportunity to correct its errors before they are raised on appeal).

¶ 85    Accordingly, we do not reach the estate's due process argument.

¶ 86    For the reasons stated above, we affirm the circuit court's affirmance of the pension board's decision regarding Marcano's disability pension.

¶ 87    Affirmed.